*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

May 6, 2019

**BY ECF AND HAND**

The Honorable Cathy Seibel
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

    Re:    <u>United States</u> v. <u>Michael Hall,</u> 18 Cr. 431 (CS)

Dear Judge Seibel:

    The Government respectfully submits this letter in advance of sentencing of defendant Michael Hall, currently scheduled for May 9, 2019 at 3:30 p.m., and in response to defendant's sentencing memorandum dated May 2, 2019.

    Hall–who is a Career Offender not only by the Sentencing Guidelines' definition, but also by any layperson's understanding of that term–was incarcerated for much of the period from July 2000 to 2017, for violent crimes and felonious gun possession.  That did not stop him from distributing heroin and crack cocaine on nine occasions in Rockland County in 2017.  As a result of his extensive criminal history, Hall faces a United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 151 to 188 months' imprisonment, as set forth in the United States Probation Office's ("Probation Office") Presentence Investigation Report ("PSR").

    That range may seem excessively high given the quantity and weight of the narcotics crimes to which Hall pleaded guilty.  However, a sentence within the Guidelines range is entirely appropriate, based on the offense, Hall's background, his character, and his other recent criminal conduct.  First, Hall's offense is itself quite serious, and endangered the community around him.  Second, separate from this crime to which he pleaded guilty, Hall, while a three-time violent felon, possessed and sold a gun, and repeatedly talked about buying more guns.

    Taking Hall's extensive criminal history into account, and to protect the public from Hall's ongoing criminal activity, the Court should impose a substantial sentence, within the Guidelines range of 151 to 188 months' imprisonment.

**A.  Instant Offense Conduct and Other Conduct**

    From on or about March 1, 2017 to May 25, 2017, on a total of nine separate occasions, Michael Hall, a/k/a "Smiley," sold narcotics, heroin and crack cocaine, to a confidential informant working with the ATF and the Rockland County Sheriff's Office.  (PSR ¶¶ 2–10, 16).  In total, the

Hon. Cathy Seibel  Page 2
May 6, 2019

CI bought about 8 grams of crack and 22 grams of heroin over these nine buys. (PSR ¶ 17). As described in the PSR and Complaint, the CI had a longer standing drug relationship with Hall, and had previously bought drugs from him. (Complaint ¶ 21).

In 2017, the CI[1] also explained to law enforcement that he had helped broker the sale of a firearm, a .357 magnum, from Hall to a friend of his, sometime in 2016. (PSR ¶ 22). The CI told law enforcement his friend's name (the "Friend"); the Haverstraw Town Police Department had previously seized a gun from the Friend's house, which he shared with his mother, pursuant to a search warrant, after the Friend referenced the gun in a jail call while the Friend was incarcerated. During his subsequent incarceration, in 2018, the Friend was interviewed by law enforcement agents and confirmed that the CI had sold the Friend a .357 magnum in 2016, and that the Friend knew the CI had bought the gun from "Smiley," which is Hall's nickname. Most importantly, during one of the controlled buys, on March 21, 2017, Hall discussed his prior provision of a "hammer" to the CI:[2]

> CI: I ain't want to talk on the phone, but um, this dude I was in rehab with, he's cool, I smoke with him. He get like a hammer?
> Hall: No.
> CI: You can't?
> Hall: Nah.
> CI: Um alright
> Hall: I'm still trying to get the hammer back.
> CI: Uh, the one you gave me?
> Hall: Yeah, No, not the one I gave you.
> CI: I thought um, Lisa ain't have it, she told me Terrance had it.
> [Crosstalk]
> CI: If you can get one let me know.
> Hall: Alright.

During two other buys, Hall discussed purchasing guns with the CI: on March 30, 2017, the CI asked if Hall was still trying to get the "mag" back, and Hall explicitly said he was trying to get a "gun"; and on May 5, 2017, after the CI raised the possibility of Hall purchasing guns from an acquaintance, Hall expressed interest and told the CI to relay his request to purchase for specific prices, because Hall's homeboy was "looking for guns."

---

[1] As the Government made clear in the Complaint, the CI used in this case is no angel: he was arrested multiple times during the investigation, and was later arrested and incarcerated on other charges outside of New York state.

[2] The Government is submitting to the Court as evidence a CD with the relevant audio and video of this conversation, along with a letter noting the most important time periods; this was produced as Rule 16 discovery to Hall. As the Court will hear, the conversation is somewhat garbled, so the ensuing transcript is in sum and substance.

Hon. Cathy Seibel  Page 3
May 6, 2019

When law enforcement arrested Hall on May 22, 2018, they found on him approximately $1700 in cash, as well as a quantity of marijuana.[3] Hall also made numerous threatening statements spontaneously upon his arrest:

- "whoever did me I will kill that mother fucker, he's dead. Is crippen a crime? Is selling weed a crime?"
- "Tell me who gave me up. I will kill the motherfucker. The minute I'm out I'm gone, I'm moving to California. Whoever did me is a dead man. He is dead. I will kill that motherfucker."
- "I'm going to get whoever ratted on me. I can't believe I'm the only one that got picked up."
- "Is it that bitch? She sucked my dick, I sold her some drugs. She's a fucking liar."

**B. Procedural History**

Hall was arrested on a criminal complaint on May 22, 2018, presented before the Honorable Lisa M. Smith, and ordered detained. A grand jury returned a nine-count indictment against Hall on June 19, 2018, and the case was assigned to Your Honor. On September 9, 2018, Hall pleaded guilty, pursuant to a *Pimentel* letter, before Your Honor. Sentencing was initially scheduled for February 13, 2019, but has been rescheduled to May 9, 2019 at 3:30 p.m.[4]

**C. Presentence Investigation Report**

The Probation Office has calculated the offense level as follows, and as consistent with the Government's *Pimentel* letter: (1) pursuant to U.S.S.G. § 2D1.1(a)(5) & (c)(8) and Application Note 8(D), because the offense involved approximately 8 grams of crack cocaine and 22 grams of heroin, the base offense level is 18; (2) pursuant to U.S.S.G. § 4B1.1(a), the defendant is a career offender because (a) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (b) the instant offense of conviction is a felony that is a controlled substance offense; and (c) the defendant has at least two prior felony convictions of crimes of violence, to wit, convictions on or about (i) June 9, 2000, in Queens County Supreme Court, of Attempted Robbery in the Third Degree, in violation of New York Penal Law 160.06; and (ii) September 30, 2008, in Rockland County Court, of Robbery in the Third Degree, in violation of New York Penal Law 160.06, the offense level is thus 32. The Government agrees that, notwithstanding Hall's threatening comments regarding law enforcement witnesses and

---

[3] Hall and his attorney informed the investigating law enforcement agents that Hall possessed the $1,700 legitimately, and that they could and would provide documentation of that. They never did so.

[4] Hall's attorney explained in his first request for adjournment that he was seeking the adjournment to "allow me the opportunity to obtain documents necessary to complete a sentencing submission." Dkt. No. 10. In his sentencing submission, he explains that the true purpose for the adjournment was to await the Supreme Court's decision in *Stokeling v. United States*, 139 S.Ct. 544 (January 15, 2019), "since the decision would necessarily affect whether or not Mr. Hall was indeed a career offender." Hall Memo at 9. In fact, it appears that his letter request for an adjournment (filed on January 16, 2019) was filed the day *after Stokeling* was decided.

Hon. Cathy Seibel                                                                                                          Page 4
May 6, 2019

cooperators, he qualifies for the 3-point reduction for acceptance of responsibility. In total, his specific offense level is 29. (PSR ¶¶ 28–39).

The Government and Probation also calculate that Hall has ten criminal history points, and is Criminal History Category VI, based on the following:

1. On or about November 14, 1999, the defendant was convicted of Attempted Robbery in the Second Degree, in violation of New York Penal Law 160.10, in Queens County Supreme Court, was adjudicated a youthful offender, and was sentenced to 5 years' probation. (PSR ¶ 41).

2. On or about June 9, 2000, the defendant was convicted of Attempted Robbery in the Third Degree, in violation of New York Penal Law 160.05, in Queens County Supreme Court, and sentenced to 16 months' to 4 years' imprisonment; after parole violations, he was ultimately released on or about February 27, 2003 from incarceration on this sentence. Pursuant to U.S.S.G. § 4A1.1(a) & § 4A1.2(d)(1), this sentence results in three criminal history points. (PSR ¶ 42).

3. On or about January 23, 2002, the defendant was convicted of Criminal Sale of Marijuana in the Fourth Degree, in violation of New York Penal Law 221.05, in Queens County Criminal Court, and sentenced to 5 days' imprisonment. (PSR ¶ 43).

4. On or about April 23, 2002, the defendant was convicted of Criminal Possession of Marijuana in the Fifth Degree, in violation of New York Penal Law 221.10, in Queens County Criminal Court, and sentenced to 10 day's imprisonment. (PSR ¶ 44).

5. On or about November 12, 2002, the defendant was convicted of Criminal Possession of a Controlled Substance in the Seventh Degree, in violation of New York Penal Law 220.03, in Queens County Criminal Court, and sentenced to 5 days' imprisonment. (PSR ¶ 45).

5. On or about March 27, 2003, the defendant was convicted of Criminal Possession of a Weapon in the Third Degree, in violation of New York Penal Law 265.02, in New York County Supreme Court, and sentenced to 3 years' imprisonment. Pursuant to U.S.S.G. § 4A1.1(a), this sentence results in three criminal history points. (PSR ¶ 46).

6. On or about September 30, 2008, the defendant was convicted of Robbery in the Third Degree, in violation of New York Penal Law 160.05, in Rockland County Court, and sentenced to 42 months' to 7 years' imprisonment. Pursuant to U.S.S.G. § 4A1.1(a), this sentence results in three criminal history points. (PSR ¶ 47).

7. On or about December 5, 2013, the defendant was convicted of Possession of a Forged Instrument in the Third Degree, in violation of New York Penal Law 170.20, in Stony Point Town Court, and sentenced to 25 days' imprisonment. Pursuant to U.S.S.G. § 4A1.1(c), this sentence results in one criminal history point. (PSR ¶ 48).

This offense level and criminal history category lead to a Guidelines range of 151 to 188 months' imprisonment. (PSR ¶ 88.) The Government agrees with the Probation Office's calculation.

Hon. Cathy Seibel                                                                                                          Page 5
May 6, 2019

      The Probation Office has recommended that the Court sentence the defendant to 151 months' imprisonment. (PSR p. 20.)

**D. Defendant's Sentencing Memorandum**

      In the defendant's May 2 Memorandum ("Hall Memorandum"), he makes numerous objections to the factual recitation in the PSR, and argues for a substantially below-Guidelines sentence.

      Hall objects to the inclusion of paragraphs 19, 20, and 21, regarding Man-1 and Man-2's statements to law enforcement that Hall had sold them narcotics which caused them to overdose. Hall Mem. 2–4. Hall also objects to the inclusion of paragraphs 22 and 23, regarding his sale of a gun, and discussions about purchasing guns, with the CI. Hall Mem. 5.

      On the substance of his sentence, Hall argues for a non-Guidelines sentence. Hall Mem. 6–11. He bases that conclusion mostly on his history and characteristics, pointing to his difficult childhood, mental health issues, drug use, and that he was only selling drugs to support his own addiction. Hall Mem. 6–8. He also suggests that the Court should provide a variance because of the closeness of the Supreme Court vote in *Stokeling*. Hall Mem. 9.

**E. Hall's Factual Objections**

      The Government notes that Hall's objections to the PSR are four months' late. *See* Fed. R. Crim. Pr. 32(f)(1) (objections must be made within 14 days of receipt of the PSR). Because the Court has the independent obligation to resolve any disputed issues of fact, pursuant to Rule 32(i)(3), the Government addresses Hall's objections herein.

      **1. Hall's Connections to the Overdoses**

      Upon further consideration, the Government believes that while the description of the reported overdoses connected to Hall in the PSR is accurate, insofar as Man-1 and Man-2 did in fact report the overdoses and their connections to Hall to law enforcement, the Government recommends that the Court make a finding that Your Honor will not rely on the information in the PSR about the overdoses.

      Hall correctly asserts that both men made statements to medical practitioners that are inconsistent with their later statements to law enforcement about the reason for their overdoses; and their statements to law enforcement about the nature of their overdoses are mostly uncorroborated. The Government would not call either man to testify at a sentencing hearing (Man-1 is deceased and the Government would not rely on the uncorroborated testimony of Man-2). While the Government could call the law enforcement officers who interviewed both men, the Government recognizes that it would be difficult for the Court to determine the accuracy of either men's statements without their presence in the courtroom, when both made conflicting statements to their medical practitioners after application of naloxone. The Government apologizes to the Court and the defendant for its provision to Probation of information that cannot be fully

Hon. Cathy Seibel  
May 6, 2019

Page 6

established at a hearing; the Government did not recognize the import of the inconsistency between the medical records and the statement until Hall filed his sentencing letter.[5]

### 2. Hall's Firearm Sale

The Government does not so accede, however, to Hall's objection to paragraphs 22 and 23. Hall did sell a gun to the CI's friend, and that is information Probation should include in the PSR and the Court should take into consideration when sentencing Hall.

It appears from a close and careful review of Hall's sentencing memorandum that he does not actually dispute that he sold the gun to the CI's friend: instead, he merely asserts that some nebulous "gun discussions" were initiated by the CI, not by Hall. Hall Mem. at 5. That is not an objection to the actual assertion in the PSR, provided by the Government, that "the CI had purchased a gun, a .357 magnum, from HALL." PSR ¶ 22.[6]

To the extent that Hall actually does challenge whether he completed the referenced gun sale, the relevant audio from the March 21, 2017 controlled purchase, which the Government is submitting to the Court as an enclosure to this memorandum, in which Hall discusses both his prior sale and his future interest in buying guns, corroborates the statements of the CI and the friend.[7]

Hall is likely correct that the Court should not consider Hall's gun sale as relevant conduct pursuant to U.S.S.G. § 1B1.3, but that is irrelevant: Probation did not seek an enhancement to any Guidelines level, as contemplated by 1B1.3, on the basis of the gun sale; and as described in the *Pimentel* and herein, neither does the Government. Instead, the information about the gun sale is relevant to the Court's attention under U.S.S.G. § 1B1.4 and 18 U.S.C. § 3661.[8]

---

[5] The Government does note that Hall does not appear to dispute that he did at least sell drugs to, among others, Man-1. Hall Mem. at 2 ("Man-1 . . . received [heroin] from the defendant.").

[6] The Government believes that Hall should qualify for any programs he is eligible for, Hall Mem. 5, but that the PSR should accurately reflect his criminal conduct.

[7] If Hall continues his challenge, the Government would ask for a *Fatico* hearing to be held at some point in the near future, so the Government can call a law enforcement officer who participated in the interviews of the CI and the Friend regarding the gun sale (and produce the necessary pre-testimony discovery to Hall's attorney pursuant to Fed. R. Crim. Pr. 32(i)(2) and 26.2). The Government understands that the CI is unwilling to testify against Hall in open court for fear for his safety: a well-grounded fear, given Hall's terrifying post-arrest statements about committing violence against witnesses who cooperated with law enforcement.

[8] Hall is correct that Probation situated the discussion of the gun under the heading "Relevant Conduct"; it is likely more accurate to list under the heading "Other Criminal Conduct." That labeling decision does not prejudice Hall in any way, however.

Hon. Cathy Seibel  
May 6, 2019

Page 7

**F. A Substantial Incarceratory Sentence, Namely a Guidelines Sentence, is Warranted**

In the midst of an ongoing national opioid crisis, Michael Hall dealt deadly heroin, as well as crack, to the CI. This is Hall's fourth narcotics-related conviction (albeit his first felony). The CI's statements to law enforcement (described in the Complaint in this case, ¶ 21) that he had been buying narcotics from Hall for a period of time, along with the seizure of thousands of dollars of unexplained cash from Hall at his arrest, strongly suggest that Hall's drug dealing was not limited to his nine drug sales to the CI. His terrifying statements upon his arrest, threatening death and retribution to witnesses and law enforcement cooperators, show that he is a danger to the public. Hall also sold (and first possessed) a gun, to the CI for sale to the CI's friend, his fourth time illegally possessing firearms. Hall is well-deserving of the label Career Offender, and the concomitant Guidelines. He is a recidivist offender, and the 3553(a) factors point in one direction: a substantial sentence of imprisonment, to protect the public from Hall's ongoing criminal activity, and to reflect the seriousness of his crimes.

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). District courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 49 (2007). As described *supra*, and as agreed by Probation and the defendant himself, under the Sentencing Guidelines, the defendant is subject to a sentencing range of 151 to 188 months' imprisonment.

What drives the Guidelines in this case, and what should drive the Court's sentence, is the nature of Hall's narcotics dealing and his history and characteristics, namely his demonstrated pattern of violent crime. At seventeen, he committed an armed robbery; and just 6 months' later, forcibly robbed another person. In his late teens/early twenties, he possessed and sold marijuana and crack, and then was convicted of possession of a weapon. Less than two years after his release from that conviction, he committed another armed robbery. While on parole from that robbery, he committed other offenses and violated parole at least once. Within just a few months after his discharge from parole in June 2016, and in the midst of a national opioid crisis, Hall engaged again in criminal activity, dealing drugs to the CI. This offense, profiting from poisons which kill hundreds of people a day across the country, is deadly serious and merits a substantial sentence. The offense is amplified in light of Hall's near-constant violent criminal history: Hall endangered people in his community before he ever started selling drugs. The Court's sentence should send the message that heroin dealers who profit off poisons which place people's lives at risk, especially after a lifetime of other violent crimes, face serious consequences when they are caught.[9]

The Court should also consider ancillary factors from Hall's arrest as indicative of his involvement in yet more criminal activity. When arrested, Hall had nearly $1700 of cash on his person, for which he never provided any legitimate source, as well as quantities of marijuana. *See*

---

[9] Hall attempts to cast himself as a middle-man, a heroin user himself who just sold small quantities to feed his addiction. Hall Mem. 10. That is inconsistent with the facts: he was frequently available to sell heroin to the CI, including twice on the same day, March 1, 2017; and he was carrying $1700 in unexplained cash on his person upon his arrest.

*United States v. Tramunti*, 513 F.2d 1087, 1105 (2d Cir. 1975) ("[t]he possession of large amounts of unexplained cash in connection with evidence of narcotics trafficking on a large scale is similar to the possession of special means, such as tools or apparatus, which is admissible to show the doing of an act requiring those means."). Upon arrest, Hall proceeded to make frankly terrifying statements about his intention to retribute against witnesses who cooperated with law enforcement. He also repeatedly claimed he would seek to flee to California. The Government agrees that Hall has qualified for acceptance of responsibility points, but the Court should recognize that his post-arrest statements were not merely made out of anger, but by a man who has acted on his violent intentions before.

The Court should also punish Hall appropriately for his sale and possession of a gun in 2016. At the time of the sale (potentially while Hall was still on parole for his 2008 robbery), Hall was a felon at least thrice-over. Hall had previously been convicted of three "violent felonies": Attempted Robbery in the Second Degree in November 1999; Attempted Robbery in the Third Degree in July 2000; and Robbery in the Third Degree in November 2008. *See, e.g.*, *United States v. Thrower*, 914 F.3d 770 (2d Cir. 2019) (holding that "the New York offense of robbery in the third degree, which like every degree of robbery in New York requires the common law element of 'forcible stealing,' is a 'violent felony,'" as well as attempts to do so). In the layperson's sense, at least, as of 2016, when Hall sold the gun to the CI and the Friend, he was an "armed career criminal" (albeit not an Armed Career Criminal subject to a fifteen-year mandatory minimum, because he was adjudicated a youthful offender for his November 1999 conviction, *see United States v. Sellers*, 784 F.3d 876 (2d Cir. 2015)).

Hall's arguments for leniency are not persuasive. It does appear that Hall had a difficult childhood and has faced meaningful mental health problems. But that makes him little different from many of the defendants who appear before this Court. What distinguishes him, negatively, is his long criminal history and substantial prior history of violence. "Close only counts in horseshoes," says Mr. Hall, but his criminal history is not close: he has lived a life of violent crime, which is true no matter how the Supreme Court ruled in *Stokeling*. He suggests that this Court should sentence him based on what his Guidelines would be if he were not a Career Offender, but that is a red herring. He *is* a Career Offender; he *did* commit four prior violent or dangerous felonies; and he *has* re-offended again in the instant case. The Court should in no way sentence him to that extreme variance he requests, approximately 4 years (less than 1/3 of the bottom end of his actual Sentencing Guidelines range, and in line with his prior sentence on his 2008 robbery, which clearly did not deter him from re-offending.)

Michael Hall has lived a life of violence. His instant drug dealing is part of a pattern of endangering his community and disrespecting the law. This Court should recognize that pattern, and sentence Hall in a manner that recognizes his history and characteristics, the nature of the circumstances of the offenses, protects the public, and affords adequate deterrence: namely, a

Hon. Cathy Seibel  Page 9
May 6, 2019

substantial period of incarceration within the Sentencing Guidelines, 151 to 188 months' imprisonment.

                Respectfully submitted,

                GEOFFREY S. BERMAN
                United States Attorney

        By: /s Samuel L. Raymond
             Samuel L. Raymond
             Assistant United States Attorney
             (914) 993-1946

cc: Paul Rinaldo, Esq. (via ECF)